UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

**JO ELLEN TOWRY, individually and
as representative of the estate of
JOHN E. TOWRY, DECEASED;**
    *Plaintiff*,

v.

**UNITED STATES OF AMERICA,**     Case No. SA-17-CV-00509-JKP
    *Defendant*.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This is a healthcare negligence case brought against the United States of America pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq*. Plaintiff Jo Ellen Towry, Individually and as Representative of the Estate of John E. Towry, Deceased, initially filed this suit on June 8, 2017 (ECF No. 1). On August 14, 2017, Defendant filed an Answer thereto (ECF No. 6). The case was reassigned to the undersigned on August 12, 2019 (ECF No. 27). At reassignment, the case had a February 18, 2020 trial setting. Upon good cause shown by Plaintiff's counsel, this Court re-set trial to March 23, 2020. Thereafter, trial was continued several times due to the COVID-19 pandemic. The bases for such continuances included orders of the Court continuing all trials, and travel restrictions that prevented out-of-state witnesses from testifying in person.

In February 2021, the case was tried to the Court, sitting without a jury. Trial commenced on February 1, 2021, and concluded on February 4, 2021, after the presentation of evidence. A draft trial transcript was prepared and Plaintiff and Defendant annotated their Proposed Findings of Fact and Conclusions of Law, which were filed on June 8, 2021 (ECF Nos. 90, 91).

The Court has reviewed the record and the evidence presented at trial. The Court has made determinations as to the relevancy and materiality of the evidence, assessed the credibility of the witnesses, and ascertained for its purposes the probative value of the evidence presented. After such consideration, the Court finds the following facts have been proven by a preponderance of the evidence, and applying law to such facts, makes the following conclusions of law.

### A. SUMMARY OF THE CASE

1. This case arises from medical care provided by Brooke Army Medical Center (BAMC) healthcare providers to John E. Towry, husband of Jo Ellen Towry. Plaintiff alleges that BAMC healthcare providers furnished negligent medical care to John E. Towry from March 2015 through May 2015. (ECF No. 1, pars. 10-11).

2. Plaintiff argues that on March 23, 2015 and/or April 10, 2015, Mr. Towry's healthcare providers failed to meet the hematology and oncology standard of care when they did not order or perform a bone marrow biopsy (Draft Tr. 4:18-23)

3. Plaintiff also argues that on or about March 25, 2015, Mr. Towry's healthcare providers failed to meet the standard of care when Anakinra was prescribed and administered to Mr. Towry for an off label use, to wit: to treat the symptoms of Calcium Pyrophosphate Deposition Disease, specifically, that it was prescribed to a patient with ongoing infections and malignancies (Draft Tr. 4:24-5:4).

### B. PARTIES

4. The Plaintiff in this case is Jo Ellen Towry, Individually and as Representative of the Estate of John E. Towry, Deceased (ECF No. 1, para. 1). Mrs. Towry is a resident of Spring Branch, Texas (ECF No. 1, para. 3).

5. The Defendant in this case is the United States of America (ECF No. 1, para. 7).

## C. APPLICABLE LAW

6.  Under the FTCA, liability for medical malpractice is controlled by state law; in this case, the law of the State of Texas is controlling. *Jenkins v. United States*, 733 F. App'x 218, 219 (5th Cir. 2018) (citing *Ayers v. United States*, 750 F.2d 449, 452 n.1 (5th Cir. 1985)).

7.  Under Texas law, "a cause of action against a [healthcare] provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or [healthcare], or safety or professional or administrative services directly related to [healthcare]" is a healthcare liability claim. Tex. Civ. Prac. & Rem. Code § 74.001(13).

8.  To establish liability a plaintiff must prove: (1) the healthcare provider's duty to act according to an applicable standard of care; (2) a breach of that standard of care; (3) injury; and (4) causation. *Hamilton v. Wilson*, 249 S.W.3d 425, 426 (Tex. 2008). *See also Urbach v. United States,* 869 F.2d 829, 831 (5th Cir. 1989).

9.  A healthcare provider has a duty to render care to a patient with the degree of ordinary prudence and skill exercised by healthcare providers of similar training and experience in the same or similar community under the same or similar circumstances. *Hollis v. United States*, 323 F.3d 330, 336 (5th Cir. 2003); *see also Speer v. United States*, 512 F. Supp. 670, 675 (N.D. Tex. 1981), *aff'd*, 675 F.2d 100 (5th Cir. 1982)). "The circumstances to be considered include, but are not limited to, the expertise of and means available to the physician-defendant, the health of the patient, and the state of medical knowledge." *Hood v. Phillips*, 554 S.W.2d 160, 165 (Tex. 1977).

10. Unless the mode or form of treatment is a matter of common knowledge or is within the experience of a layperson, the plaintiff must produce expert testimony to establish the standard of care and its breach. *Bradfield v. United States*, 471 F. App'x 364, 365-66 (5th Cir. 2012); *Hood v. Phillips*, 554 S.W.2d 160, 165-66 (Tex. 1977). *See also Jelinek v.*

*Casas*, 328 S.W.3d 526, 533 (Tex. 2010); *Haddock v. Arnspiger*, 793 S.W.2d 948, 951 (Tex. 1990) (noting that expert testimony is not needed to establish breach of a medical duty where the departure is plainly within the common knowledge of laypersons, such as leaving a sponge in a patient after surgery).

11. Causation is proved by presenting evidence of a reasonable medical probability that the injuries were caused by the negligence of one or more defendants. *Young v. Mem'l Hermann Hosp. Sys.*, 573 F.3d 233, 235 (5th Cir. 2009); *Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 247 (Tex. 2008) (noting testimony from a defense expert on a "possible" cause is conjecture and speculation that does not meet the reasonable medical probability threshold).

12. Reasonable medical probability means that it is more likely than not that the ultimate harm or condition resulted from the healthcare provider's negligence. *Bustamante ex rel. D.B. v. Ponte*, 529 S.W.3d 447, 456 (Tex. 2017); *see also Jelinek v. Casas*, 328 S.W.3d 526, 532-33 (Tex. 2010); *Kramer v. Lewisville Mem'l Hosp.*, 858 S.W.2d 397, 399-400 (Tex. 1993).

### D. FINDINGS OF FACT

13. John E. Towry was born on July 3, 1945 and died on May 24, 2015. He was sixty-nine years of age at the time of his death.
14. Mr. Towry suffered severe neck pain.
15. Mr. Towry had a long medical history of low blood platelet counts.
16. A low blood platelet count can be one symptom of acute myeloid leukemia (AML).
17. Acute myeloid leukemia can present de novo or develop over a period of time (during trial, de novo was described as "pop up" "spring forth" "quickly" "suddenly" and that de novo means there was no pre-existing blood cancer, bone marrow disorder, or myelodysplastic syndrome (MDS)).

18. To conclusively confirm or rule out a diagnosis of acute myeloid leukemia or other hematologic malignancy, healthcare providers perform a bone marrow biopsy.

19. Upon the advice and counsel of his healthcare providers, Mr. Towry twice declined or deferred a bone marrow biopsy.

20. Healthcare providers commonly prescribe medications for off label use.

21. Anakinra (a/k/a Kineret) has been prescribed off label to patients with Calcium Pyrophosphate Deposition Disease (CPPD).

22. Mr. Towry had been diagnosed with CPPD.

23. Mr. Towry's health care providers prescribed Anakinra to treat his CPPD-related symptoms.

24. Mr. Towry agreed to the administration of Anakinra and administered the drug himself.

### E. CONCLUSIONS OF LAW

25. The Court has jurisdiction under the FTCA and Texas substantive law applies.

26. To establish liability, Texas law requires Plaintiff prove by a preponderance of the evidence: (1) the healthcare provider's duty to act according to an applicable standard of care; (2) a breach of that standard of care; (3) injury; and (4) causation.

27. Plaintiff failed to prove that Mr. Towry's healthcare providers breached the standard of care.

28. The Court finds the testimony of Defendant's expert, Dr. Balijepalli Netaji, to be more credible than the testimony of Plaintiff's expert, Dr. Arnold D. Rubin.

29. The Court finds persuasive Dr. Higgs's testimony that a team of healthcare providers worked through a differential diagnosis, which included imaging studies and extensive lab work, and that Dr. Higgs consulted with the healthcare team, considered the results of the

testing, and weighed other treatment options before prescribing Anakinra. Draft Tr. 44:19-68:13.

30. The Court finds persuasive the testimony of Dr. Gabriella Cardoza-Favarato that Mr. Towry's cause of death was acute myocardial infarction. Draft Tr. 395:3-21.

31. The Court finds persuasive Dr. Netaji's testimony regarding the probability of infection generally and the probability that sepsis was a cause of death specifically. Draft Tr. 724:17-725:13; 734:20-25.

32. The Court finds persuasive Dr. Netaji's testimony that the healthcare providers met the standard of care with respect to prescribing Anakinra to Mr. Towry and any agreement or decision with Mr. Towry to defer a bone marrow biopsy.

> MR. GILLIGAN: Back on 2015, at the time in question in this case, March and April of 2015, was Anakinra a safe or dangerous drug, if you know?
> DR. NETAJI: It was safe. It was not a dangerous drug.
> Q. Okay. What do you base that on? What is the foundation of your opinion?
> A. If you look at the physician label for usage of Anakinra, the infection rate is only like [two] percent serious infections, compared to [one] percent in placebo.
> Q. What does that mean?
> A. That means that the risk of a serious infection from Anakinra is small.
> Q. Okay. You heard the testimony of Dr. Rubin today, saying that he felt that Mr. Towry had an infection that they just couldn't find, but the clinical picture was such as of an infection. . . . Do you agree or disagree with that?
> A. I disagree with that.
> Q. Why?
> A. Because they did a lot of cultures before they start him on prospect antibiotics, which include Vancomycin, Aztreonam, Levofloxacin and Caspofungin. So they were covering for gram positive, gram negative, antifungal, all these drugs, all bacteria were covered on that. And I think the temperature spike that you see, you can get it from AML, you can get it from CPPD. It doesn't have to be an infection. . . . Can I completely rule out an infection? Probably not, but based on the facts that I'm seeing that they did extensive cultures and they're all negative, AML itself can cause fever, CPPD can cause fever. . . . Without any infection.
> . . .

6

THE COURT: I want to look at page [two] of your 2018 report, Doctor. So you have that one large paragraph that starts with the word "Anakinra." . . . Midway down, there's a sentence that states, acute leukemia caused his death, not Anakinra. How do you reconcile that statement with the statement in the autopsy that it's a heart attack?

DR. NETAJI: The way I reconcile that is acute leukemia has immature cells blasts. When you already have atherosclerosis where your arteries are narrow, [ninety] percent on the left main, left anterior descending was greater than [seventy-five] percent. There probably was on the right side too because we don't have a number on the right side. But if you see the CAT scan of the chest that was done in May, they did a CTHS, they had extensive coronary calcifications. So my impression was that this blast, when you narrow it down, these are live cells. They can occlude it. And that creates a heart attack. So I still think that MI is a reflection of an underlying acute myelogenous leukemia. Everything triggers from -- his history is disposed to heart attacks to begin with from coronary artery disease and acute myelogenous leukemia, just put him through it. . . .

THE COURT: I want to make sure I understand that last answer. Was the heart attack, in part, caused by the leukemia? Is that what you're saying, or the stress that caused the body?

DR. NETAJI: It's a combination. It's got atherosclerosis to begin with. . . . On top of it, you put acute leukemia on it. That combo has serious implications there. Because these immature cells are large. And they can go and plug in. So if you asked me what is the data of patient's presenting with [an] acute myocardial infarction, who have acute myelogenous leukemia, the data is only 1.2 percent with no [comorbidities]. Boxed in with acute myelogenous leukemia. This is the incident. But if you have comorbidities already pre-existing atherosclerosis, you also have microinfarcts in his brain also from previous syncopal episodes. You can't detect those on the scan. . . .

THE COURT: But does it contradict the conclusion reached by the pathologist regarding the cause of death, being the heart attack?

DR. NETAJI: The cause of death was still acute myocardial infarction. . . . But what caused the acute myocardial infraction?

. . .

Sometimes you can look at everything and you may not be able to detect an underlying myelodysplasia, acute leukemia. But looking at the smear, looking at the platelet counts -- and platelet count doesn't reflect what is going on with him. Because his other comorbidities with CPPD and he had multiple ER visits admissions, and that confuses the picture there. So have they done due diligence in looking at the smear and everything else to see if there is any evidence of myelodysplasia on the smear? I think Dr. Hiles did that. She looked at the smear

and she couldn't find anything in that and the platelet counts were back to 120,000.
THE COURT: . . . so stated another way, and tell me if I'm accurately capturing [your] testimony. The fact that he had a heart attack, that the blockage was caused by the leukemia doesn't mean they didn't meet the standard of care earlier?
DR. NETAJI: Right.

Draft Tr. 724:5-725:13; 764:13-766:17; 767:20-768:12.

33. The experts and treating healthcare providers who testified to the necessity of a bone marrow biopsy agreed that a provider could strongly encourage a patient to undergo the procedure but could not force a patient to submit to the procedure.

34. Based on the expert testimony and the evidence presented at trial, the Court concludes the healthcare providers did not deviate from the standard of care in their care and treatment of Mr. Towry. Specifically,

   a. the prescription and administration of Anakinra did not deviate from the standard of care and

   b. the healthcare providers did not deviate from the standard of care when they recommended that Mr. Towry have a bone marrow biopsy but did not direct Mr. Towry to submit to a bone marrow biopsy.

### F. CONCLUSION

In accordance with these findings of fact and conclusions of law, Plaintiff takes nothing on her claims. A separate judgment will be entered contemporaneously herewith. Defendant shall file proposed bill of costs on or before August 6, 2021.

**It is so ORDERED this 2nd day of July 2021.**

_____
**JASON PULLIAM**
**UNITED STATES DISTRICT JUDGE**